JESÚS MARÍA ROSSY, Plaintiff and Appellee, v. RAFAEL DEL VALLE ZENO, Defendant and Appellant.

No. 3849. Argued April 21, 1927.—Decided July 28, 1927.

M. Rodríguez Serra, J. H. Brown and J. Martínez Dávila for the appellant. Luis Llorens Torres, J. M. Rossy and Acuña & Janer for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

The previous history of this case may be found in *Rossy v. Del Valle*, 34 P.R.R. 696, and in *Del Valle, Petitioner*, decided August 5, 1926, by the Circuit Court of Appeals for the First Circuit.

Appellant insists that the court below erred:

"1. In holding that, according to the contract made between the parties, the defendant failed to deliver a daily ticket or voucher for each truck loaded with stone that should leave the leased premises.

"2. In holding that the defendant did not comply with the obligations imposed upon him by the contract, relative to the delivery of the tickets or vouchers at the time that the truck left the premises.

"3. In holding that the defendant did not pay the sum of $51.42 of the instalment for the month of June, 1925, according to the drafts that he accepted, and which were drawn by plaintiff in favor of Sánchez Morales & Co."

We quite agree with appellant that the third of these propositions has been definitely established by the Circuit Court of Appeals in *Del Valle, Petitioner, supra*.

In the court below the case was submitted upon a stenographic record of the evidence and decided by a judge who did not preside at the trial. From the statement of the case and opinion upon which the decision so reached was based we take the following extract:

"The evidence for the plaintiff with regard to the first cause of action tends to show that neither the defendant nor his representative complied with the contract by delivering the vouchers or tickets for each truck loaded with stone leaving the property to the representative of the plaintiff, he always making excuses for that fault; that he only delivered on some occasions weekly and monthly summaries of the stone extracted, and that the defendant said on a certain occasion to the plaintiff that it was much work to give the tickets every day. And the evidence for the defendant tends to show that stone was taken from the quarry and hauled away in trucks daily, there being a ticket made for each truck in triplicate, one for the person to whom the stone was sold, another as a voucher signed by the said person, and another that was left in the posses-

sion of the representative of the defendant on the property, and of which a copy was made according to the testimony of Pelegrín Nevarez and delivered every evening to Félix Zavala, the representative of the plaintiff, sometimes personally and other times to his wife, and that on August 1, 1924, the representative of the plaintiff having refused to receive them, they were sent to the plaintiff by letter of August 8, 1924, that is, the statement for the month of July and the vouchers for the first week in the month of August.

"The evidence is contradictory as regards the delivery of these vouchers, but taken as a whole, inasmuch as we have not had an opportunity to consider the testimony of the witnesses in their manner of testifying, it is deduced that the defendant did not deliver the vouchers or tickets for each truck of stone that left the quarry, but copies of the vouchers or tickets for the trucks that left the property during the day, and with that it is clear that the contract was not complied with wherein it obliged him to deliver to the representative of the plaintiff, so that he might make a daily note of it, a voucher or ticket for each truck leaving the property at the time when the truck left."

The specific finding upon this point, however, after a discussion of the evidence bearing upon other questions involved, is not so carefully qualified. It follows:

"(a) That the defendant failed to perform his obligation of delivering daily a voucher or ticket for each truck of stone that left the property of the plaintiff. . ."

A majority of this court are thoroughly convinced not only of the correctness of the construction placed upon the contract by the court below but also of the falsity of the testimony tending to show a daily delivery of vouchers in accordance with the construction contended for by appellant. There is much to be said in support of this view of the matter, which could be far better expressed by any member of the majority than by the writer of this opinion, who does not deem a final determination of either of these questions necessary to a disposition of the present appeal, and who does not regard the doctrine of *Del Toro* v. *The Juncos Central Co.,* 276 Fed. 894, as conclusive upon the question of waiver involved in this aspect of the instant case.

The agreement of lease contains a clause which reads as follows:

"6. In order to determine the number of cubic meters of stone sold monthly by Del Valle Zeno the following rule shall be observed:

"The representative of Rossy shall make daily notes of the stone sold in accordance with the vouchers of transportation or tickets for each truck or other vehicle leaving the property given to him by the representative of Del Valle Zeno. These transportation vouchers or tickets shall bear the name of the driver, the number of cubic meters of stone, the date on which the transportation is made and be signed by Del Valle Zeno or his agent. When the trucks haul pulverized stone (carbonate of lime) each ton and a half of powdered stone is considered as a cubic meter of stone. The total number of cubic meters stated in the transportation vouchers or tickets during a month shall be paid by Del Valle Zeno to Rossy within the first five days of the following month in accordance with the fifth clause in the manner established."

Rental was to be paid at a specified rate per cubic meter of stone removed from the leased premises and Del Valle, according to his own statement, because of a larger experience in the management and operation of quarries, drafted the clause in question.

The express purpose of this clause was to provide a method of determining the number of cubic meters of stone removed monthly by Del Valle. An agent of Rossy, not the foreman employed by Del Valle, was to keep the daily account. It was this account or check upon the quantity and kind of stone removed which was to be kept in accordance with the transportation vouchers or tickets "which for every truck or other vehicle that should leave the premises" were to be delivered by Del Valle's foreman. Manifestly the delivery of such tickets or vouchers to an employee of Rossy, dated and signed by Del Valle or by the foreman in charge of the quarry and specifying the name of the chauffeur and the number of cubic meters of stone transported by him was not designed to enable either Del Valle or his foreman to keep an account of the quantity of stone removed but neces-

sarily and exclusively for the benefit and protection of the lessor. Again each ton and a half of pulverized stone was to be counted as a cubic meter of stone and if deprived of an opportunity for inspection of each truck load of stone at the time of leaving the premises Rossy would have no means whatever of ascertaining the number of tons of pulverized stone actually removed. Obviously the delivery at the close of each day of vouchers or tickets purporting to cover all stone removed during that day would involve the keeping of the daily account by Del Valle or by his foreman for Rossy as well as for themselves and would relieve the agent designated for this purpose by the lessor of all care and responsibility in this regard unless competent to keep an accurate and independent record of the kind and quantity of stone contained in each truck upon leaving the quarry as well as of the number of truck loads removed, to say nothing of the increased amount of time and inconvenience required by the substitution of such a system.

The principal argument advanced by appellant against the construction placed upon the contract by the court below is based upon the supposititious impracticability of making a separate delivery of each ticket or voucher at the time of departure. Appellant assumes that a substantial compliance with the contract as construed by the court below would have required the presence of Del Valle's majordomo as well as that of Rossy's representative in person at the moment of delivery in each instance. In this connection, counsel say:

"The plaintiff-appellee himself admits in his testimony that Del Valle, who was recognized by the adverse party as an expert on the contract, drew the sixth clause, and the construction of this clause cannot be other than that placed upon it by its framer.

"And it cannot be otherwise, in addition to the reasons stated, because it would have been practically impossible to comply with a clause which requires that for each truck that leaves the premises the foreman must deliver to Rossy's foreman a 'ticket,' if we take into account the fact that there were twenty or thirty trucks leaving

the premises daily, and it would have been necessary for Rossy's foreman to do nothing else but to remain at the gate receiving the 'tickets' and for Del·Valle's foreman to be riding on each truck that should leave the premises in order to deliver the ticket, because the delivery, according to the contract, is from foreman to foreman. If at the time that the truck was to leave the premises Rossy's foreman was not at the gate, but doing some other errand, then all the business of Del Valle would have been stopped. . .

"Even when they were delivered together, at the rate of one for every truck that left the premises during the afternoon, at the end of the day's work, there was one occasion on which the delivery had to be made to the wife of foreman Zavala, because he was absent in Juncos selling Rossy's lime!"

But the contract does not specify a delivery in person by Del Valle or by his majordomo. The vouchers were made in triplicate by the filling in of blanks in a printed form. The chauffeur in charge of each truck carried duplicate vouchers, one for the consignee and another to be signed by him as a receipt and returned to the foreman. Every truck that left the quarry passed by the door of the house occupied by Rossy's representative. In the absence of such representative the ticket might have been left by the chauffeur with the wife or other member of the family, as was done in the case of the deliveries made at the close of the day. Any woman or child, if called to the door, could have received the ticket and reported whether the truck was large or small and whether it carried crushed stone in bulk, or pulverized stone in sacks. In any event Rossy would have had little reason to complain if this course had been adopted by Del Valle.

Rossy stipulated for a minimum rental of one hundred dollars per month, regardless of the quantity of stone removed, and there is nothing to show that he expected to receive an average amount of much more than that. It is hardly reasonable to suppose that he contemplated the payment out of the money so·received of a competent inspector who would give all of his time and attention to the keeping

of a strict account without the aid or co-operation of Del
Valle or of his majordomo. Yet the interpretation sought
to be placed upon the contract by appellant would necessitate
the continuous presence of such a representative either at
the quarry or at the gate through which the trucks were to
pass upon leaving the leased premises unless the lessor should
prefer to leave the matter of bookkeeping entirely in the
hands of his lessee and thereby to abandon any benefit or
advantage that might have been derived from a compliance
with the sixth clause of the contract.

Aside from the conflict in the testimony as to the protest
said to have been made by Rossy and by his agent in various
interviews with the foreman in charge of the quarry and
with Del Valle, and aside from a like conflict as to the daily
delivery of vouchers at the close of the day as claimed by
Del Valle and his foreman and denied by Rossy and his
representative, the actual rendering of weekly and monthly
statements by the foreman is inconsistent with the theory of
a daily delivery of tickets for the simple reason that in the
event of such delivery a weekly or monthly statement would
have been plainly superfluous. With a single exception each
of these statements is entitled "Conduce" and no reference
whatever is made in any of them to a previous delivery of
tickets or vouchers. The letter from the foreman dated
August 8, 1924, that is to say, the day after the present suit
was filed, not only omits all reference to any such daily
delivery or attempted daily delivery but by plain implication
points persuasively to a contrary conclusion. It follows:

"Dear don Jesús: I am sending you the statement for last
month and the vouchers for the first seven days of this month.
The other day I called on Félix in order to give him the statement,
but he told me to deliver it to you, and I kept it, hoping to see
you. Today I sent him the statement for the first seven days of
this month and he said the same thing. He had told me to keep

them and I have them. If you need them please tell me since when he has failed to deliver them to you, in order that I may issue them and send them to you. Yours truly, (sgd.) P. Nevárez."

The majority therefore holds that Del Valle persistently violated the sixth clause of the agreement of lease, that Rossy at most merely tolerated the delinquency of Del Valle in this regard and, applying by way of analogy the doctrine announced by the Circuit Court of Appeals in *Del Toro* v. *The Juncos Central Co., supra,* that mere tolerance on the part of a lessor does not amount to a modification of the contract. The writer, for the purposes of this opinion concedes the breach and the fact of protest by Rossy in the form and manner described by him as a witness, but is not prepared to say, in the absence of a more definite and strenuous objection and after such long continued acquiescence in the substitution of monthly statements and uniform acceptance of such statements, that Del Valle was not entitled to any notice whatever of an intention to evict him forthwith upon the ground of forfeiture in the event of further failure to deliver a ticket or voucher for each truck or other vehicle loaded with stone that should leave the leased premises.

Counsel also say, however, that the court below erred:

"4. In holding that the defendant was obliged to pay the rental for July, 1924, within the first five days of the month of August, 1924; and that the obligation to pay such rental matured within the first five days of the month of August, 1924," that

"5. The court also erred in finding that the plaintiff asked the defendant for the statement of July, 1924, and the check therefor, on exactly the 5th of the following August, and that it was not delivered on that day nor deposited in the mail, which, in the opinion of the court, furnished a legal ground for the unlawful detainer proceeding," and

"6. In sustaining the complaint and ordering the eviction of the defendant from the premises."

The fourth proposition is based by appellant upon the

fact that the contract of lease was dated June the 1st, 1922, and contains a clause which reads as follows:

"Fifth.—The 'Quarry Right' aforesaid shall consist in the payment by Del Valle Zeno to Rossy of a fixed amount of money for each cubic meter of stone extracted for sale by the former in accordance with the following scale:

"a. If the extraction should be 400 cubic meters during each month or less than that amount, or even if there should be no extraction, Del Valle Zeno shall pay to Rossy the sum of $100 a month within the first five days of the following month and beginning to count from the date of the making of this contract which is signed by both parties.

"b. If the extraction should be to the amount of 400 cubic meters and more, then Del Valle Zeno, in addition to the $100 fixed in the preceding paragraph, shall pay to Rossy ten cents for each cubic meter of stone in addition to the 400 meters fixed in paragraph a extracted by Del Valle Zeno for sale, making the payment also within the first five days of the month following the extraction and beginning to count from the date of the making of this contract which is signed by both parties."

It is not pretended that the parties had in mind or meant to specify a lunar month or a month of thirty days or anything but the Gregorian calendar month, and a series of monthly payments extending over a period of two years or more points conclusively to an understanding on the part of appellant that the calendar month was intended.

The theory of appellant seems to be that counting from and after June 1st, 1922, the date of the contract, and excluding that date, the next ensuing month would begin always upon the second instead of the first and therefore the "first five days" would expire on the sixth and not on the fifth of the usual calendar month throughout the term of the contract.

The clause in question was drafted by Del Valle, who is not a notary or a lawyer but an engineer and agriculturist. There is no intrinsic evidence of revision by the notary before whom the instrument was executed and neither of the

parties testified to any amendment or modification of the original draft.

The thought uppermost in the minds of the parties was not the date upon which the monthly payments were to be made but the date from which the time to be covered by those payments was to run. Del Valle was to pay one hundred dollars per month regardless of the quantity of stone removed from the quarry. But paragraph "A" is not so worded. The first reference to time is in connection with the quantity of stone that was to be removed "during each month." Payment was to be made for the month during which such stone was quarried and removed from the premises, or might have been so quarried and removed. If the quantity of stone quarried and sold should exceed a specified amount Del Valle was to pay in addition to the minimum rate of one hundred dollars per month ten cents per cubic meter of such excess. In either event such payments were to be made within the first five days of the month following that in which the stone was quarried and removed from the leased premises. The vital question was not whether the time for each monthly payment should expire on the fifth or the sixth of the month following that during which the stone had been removed, but rather whether the month of June should be included within the time to be covered by such payments. The month of June had already begun to run. Machinery was to be installed and much preliminary work was to be done before actual operations could begin. Del Valle testifies that no stone was quarried during the first two months of the contract. Under the contract as worded, payment was to be made by the month for each month during which the quarry was being worked whether any stone was actually removed and sold or not. These payments were to be made within the first five days of the calendar month following that during which the stone had been quarried and sold or might have been quarried and sold, and in order to remove any doubt

as to the time to be covered by the first of such payments, not as to the time when such payments were to be made, it was provided that the month of actual operation or the month during which such operations might have been carried on should begin to run from the date of the contract.

The purpose was to include the calendar month of June, or at least to dissipate any doubt as to whether or not it should be deemed to have been included, not to provide for an overlapping of calendar months, or to create any confusion as to the plain meaning of the provisions as to payment during the first five days of the calendar month following that during which the stone had been quarried or might have been quarried. And here also we have a practical and common-sense interpretation of the contract by the conduct of the parties thereto and especially by that of appellant in the rendering of monthly statements and liquidations and payments made by him, and the uniform acceptance thereof by Rossy from the date of the lease to the time of the present controversy.

Turning to the documentary evidence adduced by defendant we find the following: a letter dated September 1, 1922, purporting to have been written "pursuant to the fifth clause of the contract of lease" containing a statement as to the quantity of stone removed during the preceding month of August and enclosing a check for the amount due according to said statement; a like letter dated October 1, 1922, in regard to the stone removed during the preceding month of September; a like letter dated November 1, 1923, in regard to stone removed during the preceding month of October; a like letter dated December 1, 1923, referring to the stone extracted during the previous month of October (sic); another dated January 1st, 1923 with reference to stone removed during the preceding month of December; another dated February 1st, 1923, with reference to stone removed during the preceding month of January; another

dated March 1st, 1923, concerning stone removed during the preceding month of February; another dated April 1st, 1923, in regard to stone removed during the preceding month of March; another dated May 1st, 1923, giving the quantity of stone removed during the preceding month of April; another dated June 1st, 1923, regarding the stone removed during the preceding month of May; another dated July 1st, 1923, covering the stone removed during the preceding month of June; another dated August 6, 1923, covering the stone removed during the preceding month of July; another dated September 5th, 1923, enclosing check for stone removed during the preceding month of August; another dated October 4, 1923, for stone removed during the preceding month of September; another dated November 5, 1923, for stone removed during the preceding month of October; another dated December 5, 1923, for stone removed during the preceding month of November; another dated January 5, 1924, for stone removed during the preceding month of December; another dated February 5, 1924, for stone removed during the preceding month of January; another dated March 4, 1924, for stone removed during the preceding month of February; and another dated May 5, 1924, for stone removed during the preceding month of April.

And among the papers presented by plaintiff there is a resumé dated June 30, 1923, signed by defendant's foreman showing the quantity of stone removed during that month; a like statement dated July 31, 1923; another dated July 31, 1924; another dated February 29, 1924 (without signature); a letter from Del Valle dated July 3, 1924, containing a statement as to stone removed during the preceding month of June and enclosing a check in payment therefor; and a like communication dated August 5, 1924, covering stone removed during the preceding month of July.

Manifestly the contention of counsel for appellant that the words "within the first five days of the following month"

should be so construed as to exclude the first and to include the sixth of the Gregorian calendar month is an afterthought arising out of the situation in which Del Valle was placed by the failure of his bookkeeper to prepare the usual statement within the first five days of August, 1924, and his consequent unpreparedness to meet the demand for payment when made at 5 o'clock in the afternoon of the fifth day of that month.

But even otherwise, the statement, although dated or antedated August fifth, was not deposited in the Post Office until the afternoon of August seventh, 1924, and the question of construction cannot affect the result save upon the theory of a modification of the terms and conditions of the original contract and a consequent obligation on the part of Rossy to repeat the demand for payment on the sixth of August as a sufficient justification for defendant's delay in tendering his check.

Ramón Gardón, agent and attorney in fact of defendant, testified that the checks were sometimes sent by mail but that recently he had received instructions from Rossy to leave them in the office; that Rossy would call for them; that Rossy came in person to receive them; that he came on the fourth or fifth, and sometimes later, much later, at his convenience, not to accommodate witness who had the papers ready on the fifth; that witness had the liquidation always completed on the fifth; that Rossy did not come for "this check" (August fifth), but sent a person who was unknown to witness to whom witness did not dare deliver the statement and check; that witness informed the messenger that Rossy must come in person and when he did not come, witness on the following day sent the check by mail; that the messenger brought no letter; that if he had produced a letter witness would have delivered the check; that witness told the messenger to call in the afternoon and he did not come either then or the next day and thereupon witness

himself deposited the check in the Post Office; that within a month or two or three before this incident Rossy had told witness not to send the statements by mail, that Rossy would call for them in person; that witness cannot remember when he received these instructions from Rossy who many times had called for the check and did not find it because it was in the mail; that witness did not remember whether or not Rossy called for the statement in June or July, but witness gave them to him; that if Rossy did not call for the statements within two days they were sent by mail; that witness could not say whether it was in June or July that Rossy told him not to send them by mail; that at first they were sent by mail and recently Rossy told witness not to send them by mail that Rossy would call for them and witness did what he was told.

The testimony of Del Valle is in part to the effect that after the contract was signed he began to clear ground and to install machinery, pumps, sheds, motors upon concrete foundations, storehouses, tracks, cars, tools and equipment which, including the acquisition of trucks, represented an investment of some thirty thousand dollars; that actual work was begun about two months later; that the statement for July, 1924, was prepared as usual about the first to the fifth of August and Gardón had it ready, but an unknown person presented himself in the office and said that Rossy had sent him for the check; that witness knows what is going on in his office; that witness was not present but is informed; that Rossy was to call for the check between the first and the fifth and did not come; that witness was informed later in the day of the messenger's visit; that witness had given instructions along general lines to Gardón and it had been practically settled for several months that Rossy would call for the checks, but as he lived in Trujillo it was inconvenient for him to come to San Juan and it so happened that when he called for the check Don Ramón told him it had been sent

by mail and he said, ''Don Ramón, don't send it by mail, leave it here for me;'' that it was agreed that the check would not be sent by mail; that the rent for the first month was paid in advance; that upon a certain occasion Rossy stated that he could not adhere strictly to the terms of the contract according to which he could only collect from the first to the fifth; that he wanted to collect before that date in case he should be hard pressed and it was agreed that he might collect not precisely on the last day or the fifth but before; that according to the original contract the rent was to be paid within the first five days of the following month; that witness was informed by his employee, Gardón, that the messenger had come for the check; that the check was not delivered because the messenger was absolutely unknown to Gardón; that people are constantly coming to the office to buy stone, unknown carpenters and masons known only by the name that they give and among those that come and go an individual appeared saying: ''Don Jesús sends me to tell you to send him the check and the statement'' and the agent and attorney in fact for witness answered: ''Tell him to come for it later;'' that it was the first time in twenty-five months that Rossy had sent to collect, he came personally; that they waited for Rossy and when he did not come the check was sent on the following day, the seventh by mail; that the check was retained waiting for Rossy to come as was his custom; and that when he did not come it was sent by mail as usual; that it had been sent on other occasions; that when two or three days had elapsed the letter if not called for was sent by mail.

The statement made by Rossy as a witness, in so far as we are now concerned therewith is that the instalments of rent were paid at maturity by check sent through the mail; that on the fifth of August witness was in San Juan in company with Mr. Nogueras, on the street at half past five in the afternoon in the doorway of the office of Muñoz Morales

and, being in need of money requested Nogueras to go to the office of Del Valle and to tell him to send the check and statements for the month of July; that Nogueras complied with the request and brought word to witness that they would send it within three or four days; that they had been busy; that witness waited all the next day and until the afternoon of the day following, August the seventh, when the complaint was filed; that on the morning of the eighth witness went for his mail and found a letter dated August fifth, with enclosure, in the Post Office; that prior to the visit of Nogueras it was not the custom of witness to go to the office of Del Valle to receive the check; that occasionally witness went in person when in need of money, when the instalment was due and payable, but the usual method was by mail, and witness was under no obligation to go to the office; that the custom was to send the money by mail; that witness never told Del Valle not to send the check by mail; that witness always had gone to receive the checks about the third, fourth or fifth, during the first days of the month; and that witness returned the check (of August fifth) because the time for payment had passed.

Francisco Nogueras, Municipal Judge of Lares (*sic*) took the stand to say that on the afternoon of August fifth about five o'clock at the request of Rossy witness went to the office of Del Valle and said to Gardón that he had come on behalf of Rossy to receive the check and statement for the preceding month of July; that Gardón called an employee and inquired as to whether the account of Rossy had been sent and the employee replied in the negative; that Gardón then said: "I have it and cannot give it to you, we have been very busy lately, we will send it within two or three days;" that witness carried this message to Rossy and that witness had no letter.

Rossy and Del Valle both have a lively interest of course in the outcome of the present controversy. The entire

history of the case, as well as the intensity of feeling and alertness of movement so conspicuous throughout the progress of the action, points plainly to the conclusion that the values involved are much larger than would appear from a casual perusal of the pleadings and of the evidence adduced at the trial.

Rossy roundly asserts that he never told Del Valle not to send the monthly checks by mail. The burden was upon defendant to show a modification of the written contract as to time, or of the implied agreement arising out of silence as to the place of payment, coupled with the uniform practice of payment by mail. Rossy, Del Valle and Gardón are agreed that the monthly statements and checks were usually if not uniformly sent by mail during a period extending over more than a year and a half from the date of the contract. Del Valle does not say that in a personal interview with him Rossy requested that the checks be retained in the office until called for, or if he does make use of an expression which, when isolated and alone considered is open to such an interpretation, then the statement is not so clear and definite as to remove the impression derived from the general trend of his testimony. That testimony as a whole in its bearing upon this point is a mere rehearsal of what he had been told by Gardón and as such has little or no weight either of its own or as tending to corroborate the statement made by Gardón upon the stand. And if the statement of Gardón can be said to have been thus corroborated, then that of Nogueras is likewise supported, although not so much in need of re-inforcement, by the testimony of Rossy. The reference to Trujillo Alto and to the inconvenience of coming to San Juan in connection with Rossy's request that the practice of payment by mail be discontinued and by plain implication as the reason for such request betrays a curious disregard for accuracy of statement as to details that does not inspire confidence. There is not a shred of evidence to

show that the monthly statements were ever prepared, or that the monthly checks were ever signed, or that either were to be retained, at the quarry or elsewhere in Trujillo Alto. By the same token the suggestion that it was more convenient for Rossy to call at the office of defendant in San Juan than to visit the San Juan Post Office to which all the letters above mentioned were addressed must find support elsewhere than in the geographical background.

Equally unsatisfactory is the explanation that the messenger who called for the check on August the fifth was unknown to Gardón. It is not pretended that the check was payable to bearer or that it could have been collected without endorsement by Rossy, or that defendant would have been liable in the event of payment by the bank upon a forged endorsement. There is no intimation of any reason for avoiding publicity as to the amount of the check, as to the contents of the statement or as to the existence and nature of either. Both Del Valle and Gardón insist that the check and statement were ready for delivery and awaiting the arrival of Rossy at the time of the demand. The only excuse or explanation offered for the failure to meet that demand is the bare fact that the messenger was unknown to Gardón. No effort whatever was made to identify the bearer of a message purporting to come from Rossy. A word of inquiry, without more, would have disclosed the fact that Rossy was within easy reach by messenger if not by telephone. Neither Del Valle nor Gardón goes so far as to say that the general appearance, demeanor or conduct of Judge Nogueras was such as to arouse suspicion or that he was disguised as a carpenter, mason or day laborer. Nor is there anything in the testimony of either of these witnesses to indicate that a more trustworthy emissary was not immediately available. In any event if the real reason for a refusal to deliver the check was the reason now assigned therefor, then it is most unfortunate for defendant that no

counter-demand for credentials was made upon Nogueras by Gardón at the time of the interview. And if out of a desire not to offend Nogueras, Gardón abstained from stating the true reason for his refusal, then a brief note of explanation addressed to Rossy and dropped in the mail would have been at once an equally courteous act and far more satisfactory evidence of perfect good faith.

Gardón is not merely an employee with the ordinary interest of an employee in a case wherein his employer is a defendant. His position is that of an agent and attorney in fact whose principal has at stake a valuable contract the loss of which may be found to be directly due to the refusal of such representative to honor a demand for payment, unless it can be shown that the refusal in question was justified or at least excusable by reason of the manner and circumstances in which the demand was made. Gardón's version of how and when the practice of sending the monthly checks and statements by mail lapsed into innocuous desuetude is even more vague and uncertain than that of Del Valle, notwithstanding the fact that the one professes to be based upon actual knowledge while the other is conceded to be in substance a re-statement of matters reported to Del Valle by Gardón after the event. Gardón, it is true, is somewhat more specific in placing the time of Rossy's request in this regard as having been made within a month or two or three before the demand for payment on August the fifth. But he cannot remember when Rossy gave him these instructions. Assuming that they were given between the first and fifth of May, then the instalments for May, June and July payable in June, July and August were the only payments that could have been effected thereby. Gardón does not remember whether Rossy called for the statement and the check either in June or in July. He is equally uncertain as to whether or not he received his instructions from Rossy in June or July. In the face of such positive admissions, the

narrow time limit imposed by Gardón himself and his utter inability to fix either dates or facts within that time limit, the broader generalizations to be found elsewhere in the testimony carry but little weight. Whether Rossy called for his check either in June or July, or in both June and July, or whether either or both of the checks signed in June and July were retained for a time and later sent by mail, there is no adequate basis for such sweeping assertions as that Rossy came on the fourth or the fifth and sometimes later, much later at his convenience, not for the convenience of Gardón, who had the papers always ready on the fifth, and that if Rossy did not call within two days they were sent by mail, or, as somewhat more expansively expressed by Del Valle, that the check was retained waiting for Rossy to come as was his custom, and when he did not come it was sent by mail as usual; that it had been sent on other occasions; and that when two or three days had elapsed the letter if not called for was sent by mail.

There is of course no absolute incompatibility between any of these statements and the primary assertion that Rossy had told Gardón to hold the checks and statements until called for and to cease sending them by mail. But as we have shown, the statement of Gardón is practically uncorroborated and he is not only flatly contradicted upon this point by Rossy but also as to other matters by Nogueras. And if we reject Gardón's version of the interview with Nogueras we can hardly accept without question his statement as to instructions said to have been received from Rossy, but which Rossy says were never given by him. Also, to repeat, the burden of proof in this regard rested upon defendant.

With the exception of a Post-office employee whose testimony has no bearing on the point now under consideration, Nogueras is the most disinterested, if not the only disinterested witness in the instant case. His statement is brief and unequivocal. It bears none of the ordinary earmarks

of mendacity. On cross-examination it transpired that he was not acquainted with Del Valle, that he had never before visited Del Valle's office, and that he bore no letter of introduction. No other questions were asked. The fact that Nogueras was unknown to Gardón does not affect his credibility as a witness and we have no reason to doubt his statement as to what was said by Gardón in the afternoon of August the fifth.

From the findings of facts and conclusions of law filed by the district judge we take the following extract:

"The manner of sending the monthly statements and making payments thereof was by mail within the first five days of each month. And all of the liquidating letters inclosing checks addressed to the plaintiff by the defendant and offered by him in evidence from September, 1922, to May, 1924, appear to be written on dates from the first to the fifth of the month following that of the extraction of the stone, except the letter of August, 1923, which was dated the 6th. But this tolerance did not alter the contract, because 'a contract of lease is not modified for the future as to the date of payment of rent by the fact that the lessor accepts payment of some of the instalments of rent after they were past due.' Del Toro vs. Juncos Central Co., 29 P.R.R. 21; 276 Fed. 894.

"The defendant should have been considered as owing the monthly instalment of rent of $100 plus ten cents for each cubic meter of stone over and above the 400 extracted and sold, within the first five days of the following month according to the terms of the contract, and as the plaintiff asked the defendant for the liquidation for July, 1924, and the corresponding check exactly on the 5th day of the following month of August and the liquidation and payment were not made and no deposit was made in the post-office on that date, but two days later, this gave lawful cause of action in unlawful detainer. García v. Fernández, 8 P.R.R. 102.

"From all the foregoing and as a result of the evidence we find:

\* \* \* \* \* \* \*

"(c) That the instalment for the month of July, 1924, was not paid by the defendant when it became due, that is, within the first five days of the month of August, 1924."

In this we find no error.

Appellant insists that Rossy set a trap for his lessee and

that in view of the drastic character of the summary proceeding for detention, clear and convincing proof of the alleged default in payment of rental should be required.

It is true that Rossy gave no warning of an intention to take advantage of any failure to comply with the demand for payment. It may be also that he anticipated the unpreparedness of Del Valle's agent and attorney in fact to meet a demand made at the close of the business day on August the fifth. That the filing of the complaint was a rude awakening for defendant is self-evident. But Rossy was under no legal obligation to notify Del Valle at the time of the demand for payment that a failure to meet such demand would be followed forthwith by a suit for recovery of the possession of the leased premises. That is one of the drastic features of the law referred to by counsel.

It may be noted in passing that if Rossy tells the truth about the alleged arbitrary conduct of Del Valle in connection with the carrying out of the contract obligation as to the daily delivery of vouchers or tickets for each truck load of stone removed, then to say the least there were extenuating circumstances. But, be this as it may, it is our duty to enforce the law as we find it, not to brush it aside or to construe it away thereby inviting as a result of such action the conclusion that in this jurisdiction ''hard cases make bad law.'' Another crumb of comfort for those who deplore the present status of the law may be found in the trite but time-honored truism that a strict enforcement may prove to be the most effective means for bringing about the repeal or amendment of an undesirable or unsatisfactory legislative enactment.

We quite agree with appellant that the proof of default should be clear and convincing. In this case it was clear and convincing. The case of *Vannina* v. *López*, 259 Fed. 198, referred to by appellant without citation of volume or page, is not in point. Any doubt as to the necessity of a demand

in the case at bar was removed by the request for payment made on the afternoon of August the fifth, 1924. The time for payment expired on that day both by the terms of the written contract and by the mutual agreement of the parties evidenced by continuous conduct indicative of a clear understanding and contemporaneous construction of the original document. No doubt a letter containing the usual check and statement, deposited in the mail and addressed as all previous communications had been addressed to "Jesús M. Rossy, San Juan, P. R.," if so addressed and deposited before midnight of August the fifth, would have relieved defendant from any further responsibility by reason of the long established practice in this regard. In such circumstances Rossy would not have been permitted to challenge upon technical grounds the sufficiency of a tender so made. His acceptance of checks received by him through the mail at the San Juan Post Office for two years or more enclosed in letters dated with one or two exceptions on or before the fifth of each month was to all practical intents and purposes equivalent to the designation of a representative residing in San Juan to whom the monthly payment could be made when due. In view of this established custom no demand was necessary and much less after refusal to meet the demand made by Nogueras, accompanied by the statement that payment would be made within two or three days, was Rossy under any obligation to call in person at the office of Del Valle and to remain there until midnight in order to provide an adequate opportunity for payment.

The uncontradicted testimony of the Post Office employee already mentioned firmly established the fact that the letter and check dated August the fifth were deposited in the San Juan Post Office on the afternoon of August the seventh. Del Valle was thus shown beyond the shadow of a doubt and from any possible view-point under the original contract to have been in default at the time of such tender and the

burden of proof thereupon shifted to the shoulders of defendant. The effort of defendant to justify this delay upon the theory of a request by Rossy that the monthly checks and statements be retained in the office of Del Valle until called for and a disposition to carry out these instructions did not satisfy the court below and for the reasons stated above does not satisfy us that any such request was ever made or that any such instructions were ever given by Rossy.

The judgment appealed from must be affirmed.